| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION |

| | | |
|---|---|---|
| TREYVION GRAY, | § | |
| | § | |
| *Plaintiff(s)*, | § | |
| | § | |
| v. | § | |
| | § | |
| NEEDVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, NEEDVILLE | § | |
| INDEPENDENT SCHOOL | § | |
| DISTRICT'S BOARD OF | § | |
| TRUSTEES; CHRIS JANICEK, in his | § | |
| individual and official capacity; KIM | § | |
| JANKE, in his individual and official | § | |
| capacity; SCOTT VALCHAR, in his | § | No. 4:22-cv-01245 |
| individual and official capacity; TIM | § | Jury |
| SBRUSCH; in his individual and official | § | |
| capacity; CHASE RASKA, | § | |
| in his individual and official capacity; | § | |
| GLENN VECERA, in his individual and | § | |
| official capacity; JOHN WEST, in his | § | |
| individual and official | § | |
| capacity; CURTIS PHODES, in his | § | |
| individual and official capacity; STEVE | § | |
| ADAMSON, in his individual and official | § | |
| capacity; DEREK MARESH, in his | § | |
| individual and official capacity, | § | |
| | § | |
| *Defendant(s)*. | § | |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION**

1.     Plaintiff Treyvion Gray (referred to as "Gray" or "Plaintiff") files this Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") against Defendants Needville Independent School District (referred to as "NISD"); NISD's Board of Trustees (the "Board"); individual Board members Chris Janicek, Kim Janke, Scott Valchar, Tim Sbrusch, Chase Raska, Glenn Vecera and John West ("Trustees"); NISD Superintendent Curtis Rhodes ("Superintendent Rhodes"); NISD Hill High School Principal Steve Adamson ("Principal Adamson"); and Assistant Principal Derek Maresh ("AP Maresh" and, collectively with the remaining defendants, "Defendants") regarding the construction and enforcement of NISD's discriminatory Dress and Hair Policy against Plaintiff.

2.     Defendants have placed 18-year-old senior Treyvion Gray in disciplinary alternative education program ("DAEP") and prohibited him from participating in extracurricular events and activities including his upcoming commencement ceremony because of his natural locs. If this Court does not immediately intervene, Gray who is currently in DAEP in-house detention and receiving inferior instruction, will be in danger of not meeting the educational requirements to graduate in May of 2022.

3.     Plaintiff has attempted to resolve his dispute with Defendants but has been unsuccessful, and Defendants continue to refuse to allow Gray to return to regular in-class instruction on NISD's High School Campus unless he cuts his natural locs.

4.     This Motion respectfully requests the following relief:

1)     A temporary restraining order ("TRO") allowing Gray to immediately transfer out of DAEP and/or in-school suspension ("ISS") back to Defendants' regular in-class

instruction at NISD's High School Campus and allowing Gray to participate in all extracurricular activities, including the commencement ceremony on May 20, 2022 without cutting his locs; and

2) A preliminary injunction that

a) enjoins Defendants from enforcing its discriminatory hair policy against Gray; and

b) requires Defendants to allow Gray to immediately transfer out of DAEP and/or ISS back to Defendants' regular in-class instruction at NISD's High School Campus and allow Gray to participate in all extracurricular activities, including the commencement ceremony on May 20, 2022 without cutting his locs.

5. Plaintiff refers to the declarations and exhibits submitted in support of this Motion, which are set forth in the accompanying Appendix and expressly incorporated as if fully set forth herein.

# I.
# SUMMARY OF GRAY'S ARGUMENTS

6. As a sophomore at NISD, Gray began growing his hair into locs[1] as an outward expression of his Black identity and culture.

7. Since December of 2021, Gray's senior year of high school, when his locs began

---

[1] The term "locs" is used herein rather than "dreadlocks." The term "dread" in the word "dreadlocks" comes from the word "dreadful" used by English slave traders to refer to Africans' hair, which had probably loc'd naturally on its own during the Middle Passage. *See* April Williams, *My Hair is Professional Too!: A Case Study and Overview of Laws Pertaining to Workplace Grooming Standards and Hairstyles Akin to African Culture*, 12 S. J. Pol'y & Just. 138, 165 (2018).

to fall below his eyebrow, Defendants have engaged in a systematic pattern of targeting him and penalizing him for violating NISD's Dress Code and Hair Policy for wearing his hair in its natural state, including his locs.

8.    Gray meets the standard for immediate court intervention because (1) he has a likelihood of success on his claims of race and sex discrimination, as well as freedom of expression violations, based on Defendants' history of targeting him because of his race, the Dress Code and Hair Policy's facial sex discrimination, and the Dress Code and Hair Policy's infringement upon the right to freedom of expression; (2) he will suffer irreparable injury from being forced into in-house detention, including either ISS or DAEP and given inferior instruction and as a result at risk from not meeting the educational requirement to graduate —on the basis of constitutional violations, and Defendants would face no corresponding harm if Gray were allowed to transfer back into regular in-class instruction at NISD's High School Campus and allowed to participate in all extracurricular activities, including the commencement ceremony on May 20, 2022; and (3) it is in the public interest to prevent a school district from engaging in discriminatory and punitive conduct based on a wholly arbitrary hair policy.

## A.    GRAY IS SUBSTANTIALLY LIKELY TO SUCCEED ON HIS CLAIMS

9.    Plaintiff is substantially likely to prove that Defendants' conduct is discriminatory and violates his constitutional and statutory rights. Plaintiff has established a prima facie case for the following claims, which justify the requested injunctive relief:

- **<u>Sex Discrimination:</u>** NISD's Dress Code and Hair Policy facially applies only

to males and there is no policy that similarly restricts the length of female students' hair. NISD has failed to offer an "exceedingly persuasive justification" that is substantially related to an "important governmental objective." The facially discriminatory hair policy violates the Equal Protection Clause and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

- **Race Discrimination:** Defendants engaged in a focused and continued effort to force Gray to cut his locs because Defendants admittedly view his natural Black hair as contrary to NISD's "conservative dress standards." Defendants' transparent use of prejudice and stereotypes demonstrate a racially discriminatory intent that violates the Equal Protection Clause and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI").

- **Freedom of Expression:** NISD's Dress Code and Hair Policy likewise violates Gray's freedom to express his identity and cultural heritage. Gray wears his hair in natural locs—a symbol widely understood as a Black hairstyle connected to Black identity and heritage—as a sign of their identity and culture. NISD's wholly arbitrary hair policy—which attempts to regulate the way hair is worn in school—impermissibly prohibits Gray's right to free expression in violation of the First Amendment.

## B.   GRAY FACES A SUBSTANTIAL THREAT OF IRREPARABLE INJURY THAT OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS

10.   The harm to Gray, absent the immediate relief sought in this Motion, is imminent and irreparable. As an initial matter, this Court's immediate intervention is necessary to ensure Gray receives the same level of education enjoyed by other students as opposed to inferior instruction while in either ISS or DAEP. Without this Court's immediate intervention, Gray risks being disadvantage to the level of education that would prevent him from meeting the educational requirements to graduate in May of 2022. Further, it is well-established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. No amount of money can replace the loss of educational and developmental opportunities, and Plaintiff cannot wait for a full hearing on

the merits.

**C.   THE INJUNCTION SERVES THE PUBLIC INTEREST**

11.    Finally, injunctive relief supports the public's interest in protecting children from discrimination on the basis of sex or race and from the denial of their rights to freedom of expression. The requested relief likewise promotes tolerance for diverse viewpoints, and fosters understanding and sensitivity towards a multi-racial, multi-ethnic, and multi-cultural student body. It also serves the public interest to deter school districts from taking punitive action against students based on wholly arbitrary policies that serve no educational purpose.

**D.   NISD'S HAIR POLICY HAS BEEN AT THE CENTER OF PRIOR LITIGATION**

12.    In 2008, NISD placed a Native American kindergarten student in ISS because of his hair length. The child's parents filed suit against NISD and ultimately, District Judge Keith P. Ellison granted plaintiff's motion for preliminary injunction against NISD, enjoining it from enforcing its dress code, including its hair policy for male students. *See generally*, *A.A. v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863 (S.D. Tex. 2009) (holding that the plaintiff succeeded in his free exercise claim under Texas Religious Freedom Restoration Act). The Fifth Circuit affirmed the district court's judgment. *A.A. v. Needville Indep. Sch. Dist.*, 611 F. 3d 248 (5th Cir. 2010).

13.    Defendant Superintendent Rhodes, who was the superintendent during NISD's previous lawsuit challenging NISD's hair policy, prides himself on the school's conservative dress policy:

Rhodes says. "A school district is a reflection of the community. consistently been very conservatively dressed, very conservatively disciplined. It's no secret what our is: You'll cut your hair to the right point. You'll tuck in your shirt. You'll have a belt."

"If you want to think we're backwards...no one is asking you to move to Needville and have these opinions invoked on you," Rhodes says. "All the kids I graduated with — there's a bunch of us back in Needville — we never thought we'd come back. Backwards isn't all that bad when you become the parent."

"I've got a lot of friends that are Native-American Indians from Oklahoma, South Dakota, lot of places, some over in Louisiana in the Choctaw Nation, and they all cut their hair," Rhodes says. "We're not going to succumb to everything and just wash away our policies and procedures."

Ex. 3, Paul Knight, *A Native American Family Fights Against Hair Length Rules*, Houston Press (Jul. 10, 2008).

NISD's Hair Policy remains substantially the same following its unsuccessful defense of the policy during the prior lawsuit.

## II.
## NATURE AND STAGE OF PROCEEDINGS[2]

14.     Gray filed his Original Complaint against Defendants on April 19, 2022 (the "Complaint"). *See* Dkt. Entry No. 1. Plaintiff's counsel served a copy of the Complaint on Defendants via email the same day.

## III.
## FACTUAL BACKGROUND

15.     Gray began attending school in NISD in 2009, when he was in first grade. *See,* Ex. 1, Decl. of Treyvion Gray, ¶ 2; Ex. 2, Decl. Brahna Williams, ¶ 3. Prior to being placed

---

[2] Plaintiff expressly incorporates the Complaint as if fully set forth herein.

into ISS and/or DAEP, Gray was on target to graduate in May of 2022 and understood that he was exempt from taking final exams because of his grades. *See*, Ex. 1 at ¶ 41.

16.     Gray started growing his hair into locs in 2019 while he was a sophomore at NISD High School. *See*, Ex. 1 at ¶ 4; Ex. 2 at ¶ 5. He began growing locs as an outward expression of his Black identity and heritage. *See*, Ex. 1 at ¶ 4; Ex. 2 at ¶ 5.

17.     On August 11, 2021, the NISD school board voted to approve the district's Student Code of Conduct and Student Handbooks for each of the schools, including the dress code for grades 7-12. Ex. 4, NISD Student Code of Conduct and Student Handbook.

18.     The NISD 2021-2022 High School Student Handbook states that

> Boys' hair shall **NOT** cover any part of the ears, extend beyond the eyebrows, or extend over the top of a standard collar in the back when combed down (even when not wearing a standard collar). Highlights/lowlights as well as hair accessories are **NOT** allowed for boys.

Ex. 5, NISD Dress Code and Hair Policy for Grades 7-12.

19.     If students do not comply with these gender-based policies, the NISD Handbook authorizes school administrators to engage in escalating punishments against them:

> If a student's apparel is considered inappropriate by the principal or his/her designee, the inappropriate item will be confiscated, the student will be allowed to call for other clothing or will be placed in a school issued corrective clothing to be worn for the rest of the day, and the student will immediately be issued a dress code referral and must attend after school detention. If a student receives more than four (4) after school detention referrals in a one-week period, each additional referral that week will constitute persistent misbehavior and be handled as a Level II Disciplinary Offense. Any student unable or unwilling to correct the dress code violation may be placed ISS.

*Id.*

20.     The 2021-2022 NISD Student Code of Conduct reinforces the Dress Code and Hair Policy: "Students shall not violate dress and grooming standards as communicated by the student handbook." Ex. 4, NISD 2021-2022 Student Code of Conduct.

21.     If a student violates the gender-based Dress Code and Hair Policy, the NISD Student Code of Conduct empowers school administrators to remove students from campus and place them in DAEP. *Id.*

22.     NISD's stated justification for its Dress Code and Hair Policy is written in school district policy FNCA (Local), which was adopted by the NISD school board in May 2007: "The District's dress code is established to teach grooming and hygiene, instill discipline, prevent disruption, avoid safety hazards, and teach respect for authority." Ex. 6, District Policy FNCA (Local).

23.     During the 2021-2022 academic year, which is Gray's senior year, his locs had grown to a length that fell below his eyebrow. *See*, Ex. 1 at ¶ 4; Ex. 2 at ¶ 5.

24.     In December of 2021, NISD administrators began targeting Gray because of his hair length. For example, Assistant Principal Kristin Wyatt approached Gray in the hall and instructed him that his hair was getting too long and that he would have to cut his hair. *See*, Ex. 1 at ¶¶ 9-10.

25.    In January 2022, shortly after the winter break, Assistant Principal Maresh began waiting for Gray to enter the school each morning, to berate him about his hair length and to tell him that he had to cut his hair. Ex. 1 at ¶ 11.

26.    These encounters with Assistant Principal Maresh, during which he was monitoring the length and style of Gray's hair and demanding that he cut it, continued in February and March. Ex. 1 at ¶ 12.

27.    Assistant Principal Maresh continued to single Gray out for being in violation of NISD's Dress Code and Hair Policy while his fellow white male students, with similarly long hair (for example, mullet hairstyles) were allowed to walk the halls of the school violating the same Dress Code and Hair Policy without fear of reprisal. Ex. 1 at ¶ 13.

28.    Assistant Principal Maresh's confrontations of Gray crescendoed on March 3, 2022; Assistant Principal Maresh met Gray in the morning when he entered the school and told him that because he was in violation of the Dress Code and Hair Policy that he was being sent to ISS and would remain there until he cut his hair. *See*, Ex. 1 at ¶ 15; Ex. 2 at ¶ 18.

29.    This continued targeting has made Gray feel unwelcome and inferior. *See*, Ex. 1 at ¶ 15.

30.    Gray attempted to appease Assistant Principal Maresh and told him that he would put his locs in a ponytail, but that wasn't good enough for Assistant Principal Maresh because, among other things, male students were not allowed to have ponytails. Ex. 1 at ¶ 16. He demanded that Gray cut his hair and sent him to ISS in the interim. Ex. 1 at ¶ 16.

31. That same day, NISD notified Gray's mother, Brahna Williams, via email that her son was being sent to ISS because of his locs. Ex. 1 at ¶ 18; Ex. 2 at ¶ 19; Ex. 7, Disciplinary Notices for Hair Policy Violations.

32. Ms. Williams reached out to Principal Adamson to request an accommodation for Gray given that he was only 2 months away from graduation. Ex. 2 at ¶¶ 22-23.

33. Ms. Williams pleaded with Principal Adamson to "meet her halfway" and offered to pin her son's hair up to keep his hair above his eyebrows, but Principal Adamson told her that his hair also could not cover any part of his ears or touch his collar. Ex. 2 at ¶¶ 21-23.

34. In the end, Principal Adamson told Ms. Williams that he would not extend any accommodations to her son. Ex. 2 at ¶¶ 21-23.

35. Ms. Williams also reached out to Superintendent Rhodes for an accommodation for her son's locs. Ex. 2 at ¶¶ 25-26.

36. Given Superintendent Rhodes vigilant defense of NISD's "conservative" dress code it came as no surprise that he was unwilling to offer any type of accommodation other than, "You'll cut your hair to the right point." Ex. 3, Paul Knight, *A Native American Family Fights Against Hair Length Rules*, Houston Press, July 10, 2008.

37. NISD has continued isolating Gray from the student population in ISS and ultimately DAEP every school day since March 3, 2022, for being in violation of its Dress Code and Hair Policy. Ex. 1 at ¶¶ 19, 30; Ex. 2 at ¶ 26.

38.     In early April of 2022, Principal Adamson contacted Ms. Williams to advise her that Assistant Principal Maresh had notified him that Gray had exhausted the maximum number of days that he could be in ISS and that if Gray showed up to school on April 15, 2022[3] without having his hair cut, he would be sent DAEP for the remainder of the school year and not be allowed to attend the graduation ceremony.

39.     On April 19, 2022, both Principal Adamson and Assistant Principal Maresh met Gray as he entered the school. After they examined his hair and confirmed that he had not cut his hair, they sent him to ISS. Ex. 1 at ¶¶ 29-30.

40.     Principal Adamson then called Gray's mother, Ms. Williams, to ask her if Gray's hair was permanent and to inform her that following the standardized test (scheduled for April 19, 2022) Gray would be suspended for the remainder of the day for not complying with NISD's Dress Code and Hair Policy.

41.     Principal Adamson further explained that when Gray returned to school on April 20, 2022, he would be placed in DAEP for the remainder of the year.

42.     NISD students that have been placed in DAEP are prohibited from participating in in extracurricular events and activities, including NISD's upcoming commencement ceremony. Ex. 1 at ¶ 31.

43.     Because of Gray's special learning needs, he has an Individualized Education Program ("IEP"). Ex. 1 at ¶ 22.

---

[3]  NISD school was closed for the Easter holiday on April 15, 2022. Classes resumed on April 19, 2022.

44.     Among many other state mandated accommodations, Gray's IEP requires the school to provide him a teacher's aide to assist him with all his core subjects. Ex. 1 at ¶ 23.

45.     Prior to being placed in ISS and DAEP, the teacher's aides assigned to Gray had been extremely helpful to ensure that he understood his assignments and was academically successful. *Id*.

46.     At DAEP, Gray has been confined to a room for the duration of the day, where he is expected to complete homework without instruction from his regular teachers, including the teacher's aides that have been assigned to assist him with his core classes. Ex. 1 at ¶ 34.

47.     He receives his classroom assignments from Google Classroom but receives no instruction. Classwork and homework has been difficult for Gray to complete without the instruction afforded other students in class, and Gray has encountered difficulty with some of the assignments. Ex. 1 at ¶ 35; Ex. 2 at ¶ 38.

48.     Prior to being placed in DAEP, Gray was exempt from taking finals as a result of this grades but now is required to take final exams and is as risk of not meeting the educational requirements to graduate in May of 2022. Ex. 1 at ¶ 38.

49.     In addition, Gray is not allowed to interact with other students, talk, or leave the classroom without permission, and he has to eat lunch at his desk. Ex. 1 at ¶ 39.

50.     Gray has been denied access to qualified teachers, an interactive learning environment, prohibited from participating in any of the extracurricular activities and also prohibited from going on NISD's main campus and threatened with criminal trespass. Ex. 1 at ¶¶ 35-41; Ex. 8, Gray's Discipline Management Record (4-19-22).

51.     While in DAEP, Gray is required to wear slacks, a collared shirt with a tie each day. Ex. 1 at ¶¶ 35-41; Ex. 2 at ¶ 42; Ex. 8, Gray's Discipline Management Record (4-19-22).

52.     As a result of being targeted, removed from the student population and in peril of not meeting the educational requirement to graduate in May 2022, Gray's emotional health has suffered, including stress and depression. Ex. 1 at ¶¶ 35-41; Ex. 2 at ¶ 43.

53.     Gray has been denied access to qualified teachers, an interactive learning environment, educational resources, and instructive teaching. Gray's time in ISS and now DAEP has taken a significant emotional toll on him. As a result of being placed in ISS and now DAEP, Gray has felt extremely isolated and has not been able to see his friends and has been forced to figure out his assignments alone. *Id.*

54.     Gray's request for immediate injunctive relief is time sensitive because without returning to regular in-school instruction with qualified teachers, he is now at risk for not completing all the necessary requirements to graduate in May 2022.

## IV.
## GRAY IS ENTITLED TO A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION

55.     The requested TRO and preliminary injunction are proper because Gray can establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted and (4) that the grant of an injunction will not disservice the public interest. *See* Fed. R. Civ. P. 65(b); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (setting forth a four-part test to determine whether injunctive relief should

issue).

    **A.**    G<small>RAY IS</small> L<small>IKELY TO</small> S<small>UCCEED ON THE</small> T<small>HEIR</small> S<small>EX</small> D<small>ISCRIMINATION</small>, R<small>ACE</small> D<small>ISCRIMINATION, AND</small> F<small>REEDOM OF</small> E<small>XPRESSION</small> C<small>LAIMS</small>

56.    To establish a substantial likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that [he is] entitled to summary judgment." *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013). Here, Gray can establish a prima facie case for his sex discrimination, race discrimination, and freedom of expression claims asserted against Defendants.[4]

    **1.**    NISD'<small>S</small> D<small>RESS</small> C<small>ODE AND</small> H<small>AIR</small> P<small>OLICY</small> C<small>ONSTITUTES</small> S<small>EX</small> D<small>ISCRIMINATION</small>

57.    The prima facie case is clear that NISD's Dress Code and Hair Policy constitutes sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause and Title IX.

    **i.**    **Sex Discrimination in Violation of the Fourteenth Amendment's Equal Protection Clause**

58.    NISD's Dress Code and Hair Policy makes facial distinctions based on sex in violation of the Equal Protection Clause, which guarantees "the right to be free from invidious discrimination in statutory classifications and other governmental activity."[5] *Harris v. McRae*, 448 U.S. 297, 322 (1980); *see also*, *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142 (1980).

---

[4] Gray brings his equal protection, Title IX, Title VI and freedom of expression claims pursuant to 42 U.S.C. § 1983, which provides a civil cause of action for plaintiffs that can establish (1) defendants deprived plaintiffs of a constitutional or statutory right and (2) defendants acted under the color of state law. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252–53 (5th Cir. 2005).

[5] "When a state actor turns a blind eye to the [Equal Protection] Clause's command, aggrieved parties … can seek relief pursuant to 42 U.S.C. § 1983." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996).

Gender is a quasi-suspect class that triggers intermediate scrutiny review of governmental policies in the equal protection context. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Under this standard, NISD must show the hair policy serves an "important governmental objective" and the gender-based discrimination is "substantially related" to such objective. *Id.* In *United States v. Virginia*, the Supreme Court clarified the rigorous burden required for government entities to show an "exceedingly persuasive" justification for any sexually discriminatory policies:

> To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment or denial of opportunity for which relief is sought, *the reviewing court must determine whether the proffered justification is "exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State.* The State must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, *or preferences* of males and females.

*Id.* at 532–33 (emphasis added) (internal citations omitted).

59.     Given the rigorous burden placed on governmental entities employing sex-based discrimination, it is no surprise that case law "reveal[s] a strong presumption that gender classifications are invalid." *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring in judgment). The Supreme Court has recognized that school policies that perpetuate stereotyped views of the proper roles of men and women are suspect and must be subject to heightened scrutiny. *See, e.g., Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982). Consistent with that principle, before and after *Hogan*, courts have invalidated grooming or

dress codes that discriminate on the basis of sex. *See, e.g.*, *Johnson v. Joint Sch. Dist. No. 60, Bingham Cnty.*, 508 P.2d 547, 548–49 (Idaho 1973) (finding school dress code that prohibited female students from wearing slacks, pantsuits, or culottes impermissibly discriminated on the basis of sex); *Scott v. Bd. of Educ., Union Free Sch. Dist. No. 17, Hicksville*, 305 N.Y.S.2d 601, 606–07 (N.Y. Sup. 1969) (similarly finding invalid provision of school dress regulations prohibiting girls from wearing slacks except with permission of principal when warranted by cold weather); *see also*, *Hayden v. Greensburg Cmty. Sch. Corp.,* 743 F.3d 569, 577–78 (7th Cir. 2014) (compiling cases granting and denying equal protection claims in school and employment contexts); *but see*, *Karr v. Schmidt*, 460 F.2d 609 (5th Cir. 1972) (holding that denial of a student's admission to public high school because the length of his hair violated the school dress code did not violate the Equal Protection Clause).[6]

60.     Recently, in *Hayden*, the Seventh Circuit found that an unwritten school policy

---

[6] The Fifth Circuit's 1972 holding in *Karr v. Schmidt* does not apply to Plaintiffs' claim. 460 F.2d 609 (5th Cir. 1972). In *Karr*, the Fifth Circuit applied rational basis review to hold that a hair policy, which did not apply to female students, did not violate the Equal Protection Clause. *Id*. at 616. This holding is inapposite for at least two reasons. *First*, the court applied a deferential standard of review that no longer applies to regulations with facial sex-based distinctions. *Karr* was decided in 1972, four years before the Supreme Court recognized gender as a protected class in *Craig v. Boren*, 429 U.S. 190 (1976). Since *Craig*, the Supreme Court has consistently required government officials to justify laws that make sex-based classifications under the heightened intermediate scrutiny review, and that is the standard this Court should use to analyze the District's hair policy. *See*, *Virginia*, 518 U.S. at 533 (1996). *Second*, the *Karr* decision did not actually consider whether the policy's *distinction between male and female students* was constitutionally permissible. *See Sturgis v. Copiah County Sch. Dist*., No. 3:10-CV-455-DPJ-FKB, 2011 U.S. Dist. LEXIS 105065, at *6-7 (S.D. Miss. Sept. 15, 2011) ("*Karr* does not address alleged sex discrimination"). Instead, the court considered whether the classification of hair length *as between male students* contravened the Equal Protection Clause. *Karr*, 460 F.2d at 616. Here, Plaintiff's claims rest on the sex-based distinctions on the face of the policy; the policy is facially discriminatory and violates the Equal Protection Clause. *See Sturgis*, 2011 U.S. Dist. LEXIS 105065, at *7 ("Here, [plaintiff] squarely raises the sex-discrimination argument *Karr* avoided. *If* the record ultimately shows sex-based discrimination, then intermediate scrutiny would apply.").

restricting the length of male athletes' hair violated the Equal Protection Clause:

> The Haydens plainly have made out a prima facie case of discrimination. The hair-length policy applies only to male athletes, and there is no facially apparent reason why that should be so. Girls playing interscholastic basketball have the same need as boys do to keep their hair out of their eyes, to subordinate individuality to team unity, and to project a positive image. Why, then, must only members of the boys team wear their hair short? *Given the obvious disparity, the policy itself gives rise to an inference of discrimination*.

*Id.* at 580 (emphasis added).

61.     NISD's Dress Code and Hair Policy similarly gives rise to an inference of sex discrimination that Defendants cannot overcome. *Id.* NISD's Dress Code and Hair Policy expressly regulates *only* male students' hair length and does not similarly regulate the length of female students' hair. NISD has yet to offer *any* proof of an important government interest to justify its discriminatory policy, let alone an "exceedingly persuasive" justification for the policy that is substantially related to the interest. *See*, *Virginia*, 518 U.S. at 533. Regardless, any *post hoc* justification proffered now for purposes of this litigation would be inadmissible. *Id.* at 533. Put simply, there is no reason—outside of gender-based stereotypes—to permit female students to wear their hair below their eyebrows, earlobes, or shirt collar when male students are not so permitted. Defendants' conduct in promulgating and enforcing the facially discriminatory hair policy to prevent males, including Gray, from wearing his natural hair the same length as females clearly violates the Equal Protection Clause. *See*, *Hayden*, 743 F.3d at 580.

### ii.     Sex Discrimination in Violation of Title IX

62.     NISD's Dress Code and Hair Policy violates Title IX for similar reasons. Title

IX states that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). An implied private right of action exists for enforcement of Title IX.[7] *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994).

63.     "District courts regularly apply the body of law developed under analogous Title VII provisions to Title … IX claims." *Kirk v. Monroe City Sch. Bd.*, No. 17-1466, 2018 U.S. Dist. LEXIS 154376, at *14–15 (W.D. La. Aug. 24, 2018). Thus, a plaintiff bringing a claim under Title IX may use either direct or circumstantial evidence of intentional discrimination. *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994). "'Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption.'"[8] *Id.* at 328–29. If a "plaintiff presents direct evidence of discrimination, 'the burden of proof shifts to the [defendant] to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.,* 778 F.3d 473, 475 (5th Cir. 2015).

64.     On its face, NISD's Dress Code and Hair Policy provides direct evidence of sex

---

[7] "Title IX has no administrative exhaustion requirement and no notice provisions. Under its implied private right of action, plaintiffs can file directly in court." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009).

[8] "[D]irect evidence includes any statement or written document showing a discriminatory motive on its face." *Id.* at 329.

discrimination—the hair policy expressly applies only to the length of *male* students' hair and does not similarly regulate *female* students' hair length.[9] NISD has failed to offer any attempted justification for this explicit sex distinction, let alone evidence that the policy would exist absent differentiation between the sexes. Thus, Plaintiff is entitled to recovery under his Title IX claims against NISD.

### 2. NISD'S DRESS CODE AND HAIR POLICY CONSTITUTES RACE DISCRIMINATION

65.     The prima facie case that NISD's Dress Code and Hair Policy constitutes race discrimination in violation of the Fourteenth Amendment's Equal Protection Clause and Title VI is likewise evident. "To state a claim of racial discrimination under the Equal Protection Clause [], the plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Priester v. Lowndes Cnty.*, 534 F.3d 414, 424 (5th Cir. 2004) (quoting

---

[9] Even assuming the hair policy's facial sex distinction is not direct evidence of intentional discrimination, Gray's Title IX claims are still cognizable under the *McDonnell Douglas* burden-shifting analysis. *See Kirk*, 2018 U.S. Dist. LEXIS 154376, at *15 (analyzing Title IX claim under the standard established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). The *McDonnell Douglas* framework provides that a Title IX plaintiff can establish a prima facie case of discrimination by demonstrating "(1) they are members of a protected class; (2) they suffered adverse action; and (3) they were treated less favorably than similarly situated students." *Id.* (internal citations omitted). Alternatively, the third factor may be satisfied with facts to indicate that discrimination was a substantial or motivating factor in defendant's actions. *Id.* As a male, Gray is unquestionably members of a protected class. *See*, *id.* at *45. Gray has also clearly suffered adverse actions from Defendants' conduct, including being placed in ISS and DAEP, denied participation in-school educational opportunities, including qualified instructors and as a result at peril of not being qualified to graduate in May 2022 because of alleged noncompliance with the Dress Code and Hair Policy. It is also beyond dispute that Gray has been treated differently from female students with hair of similar or longer length because NISD's hair length requirement expressly only applies to *male* students' and does not similarly regulate *female* students' hair length. Gray's prima facie case of sex discrimination is clearly established, and he is entitled to injunctive relief.

*Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)). Title VI likewise prohibits discrimination on the basis of race, color, or national origin by any federally funded "program or activity," including a "local educational agency." 42 U.S.C. § 2000d-4a(2)(B). Title VI follows the Fourteenth Amendment's standard of proof for intentional discrimination. Further, federal courts regularly apply the body of law developed under analogous Title VII's provisions to Title VI. *McDonnell Douglas Corp.*, 411 U.S. at 802–803; *see also*, *Washington v. Jackson State University*, 532 F.Supp.2d 804, 810 (S.D. Miss. Mar. 15, 2006).

66.     Although NISD's Dress Code and Hair Policy is facially race-neutral, Gray can establish discriminatory intent through circumstantial evidence.[10] *See Lewis v. Ascension Parish School Bd.,* 662 F.3d 343, 348–49 (5th Cir. 2011). Discriminatory intent may be demonstrated by utilizing either (i) the *Arlington Heights* framework to establish a facially-race neutral policy was adopted with a discriminatory purpose, or (ii) the *McDonnell Douglas* framework to establish a prima facie case that plaintiff was member of a protected class, suffered adverse action, and was treated less favorably than similarly situated students. *See, e.g., Rollerson v. Port Freeport*, No. 3:18-cv-00235, 2019 U.S. Dist. LEXIS 157165, at *14–16 (S.D. Tex. Sep. 13, 2019) (analyzing Title VI claim under *Arlington Heights v. Metropolitan Hous. Dev. Auth.*, 429

---

[10] Although the policy is facially race-neutral, statements by NISD's Superintendent Rhodes indicates that the policy may be based on illegitimate criteria, including that long hair, including natural Black hair, is linked to bad performance and low expectations. For example, during a prior lawsuit involving NISD's Hair Policy, Superintendent Rhodes told the Houston Press, "We've consistently been conservatively dressed, very conservatively disciplined. It's no secret what our policy is: You'll cut your hair to the right point. You'll tuck in your shirt. You'll have a belt. How can it be outdated? How many doctors, professionals, lawyers, look at your military branches, look at bankers, how many of them have long hair?" Ex. 3, Paul Knight, *A Native American Family Fights Against Hair Length Rules*, Houston Press, July 10, 2008.

U.S. 252, 266–68 (1977)); *Washington*, 532 F.Supp.2d at 810 (applying *McDonnell Douglas* to Title VI claim). Here, Gray can prove Defendants' discriminatory intent under both standards: (i) NISD's Dress Code and Hair Policy was promulgated and motivated by negative racial stereotypes about Black hair and (ii) the hair policy was selectively enforced against Gray but not other, non-Black male students.

> ### i. Prima Facie Case of Race Discrimination under the *Arlington Heights* Framework

67.     Defendants' discriminatory intent is established under the *Arlington Heights* standard by facts showing the hair policy was motivated, at least in part, by the racially discriminatory goal of restricting Black students from wearing their natural hair or culturally significant hair formations.  The Fifth Circuit laid out the *Arlington Heights* framework in a recent case:

> In *Arlington Heights*, the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and courts must perform a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) [the policy's] history, especially where there are contemporary statements by members of the decision-making body.

*Veasey v. Abbott*, 830 F.3d 216, 230–31 (5th Cir. 2016) (internal quotation marks and citations omitted). While Gray need not establish all or any specific number of *Arlington Heights* factors, Plaintiff offers some evidence in support of all the factors and thus demonstrate a powerful inference of discrimination. *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 526

(S.D. Tex., Aug. 17, 2020) *citing Rollerson v. Port Freeport*, No. 3:18-CV-235, 2019 U.S. Dist. LEXIS 157165, at *16 (S.D. Tex. Sept. 13, 2019), *adopted*, 2019 U.S. Dist. LEXIS 182742 (S.D. Tex., Oct. 21, 2019) (This Court has observed that a plaintiff relying on the Arlington Heights analysis to demonstrate discriminatory intent through direct or circumstantial evidence "need provide very little evidence" to raise a genuine issue of material fact and that *"any indication of discriminatory motive"* may suffice to raise a jury question).

68.    NISD disproportionately enforced its Dress Code and Hair Policy length against Black students as opposed to non-Black students. For example, NISD's social media proudly depicts many non-Blake students who plainly violate the Dress Code and Hair Policy:

















69.     While NISD Dress Code and Hair Policy[11] on its faces applies to all males, it's

obvious from these pictures alone that Defendants disproportionately enforce its hair length

policy against Black students.

---

[11] "Boys' hair shall **NOT** cover any part of the ears, extend beyond the eyebrows, or extend over the top of a standard collar in the back when combed down (even when not wearing a standard collar). Highlights/lowlights as well as hair accessories are **NOT** allowed for boys." Ex. 5, NISD Dress Code and Hair Policy for Grades 7-12.

Additionally, discriminatory intent is demonstrated by the Dress Code and Hair Policy and comments made by Defendants. During a prior lawsuit involving Defendants' Dress Code and Hair Policy, statements by NISD's Superintendent Rhodes indicate that the policy is motivated by NISD's conversative views:

> We've consistently been conservatively dressed, very conservatively disciplined. It's no secret what our policy is: You'll cut your hair to the right point. You'll tuck in your shirt. You'll have a belt. How can it be outdated? How many doctors, professionals, lawyers, look at your military branches, look at bankers, how many of them have long hair?

Ex. 3, Paul Knight, *A Native American Family Fights Against Hair Length Rules*, Houston Press, July 10, 2008. Yet, Defendants only selectively monitored and enforced compliance with the Dress Code and Hair Policy against Gray, forcing him to conform to racially discriminatory views that that natural Black hair or culturally significant locs are unprofessional and linked to bad performance or low expectations. NISD's Dress Code and Hair Policy targeted Gray and his natural hair growth, making it ultimately impossible for him to comply with the Dress Code and Hair Policy without cutting his locs.

70.     By adopting and enforcing the policy against Gray, Defendants intentionally discriminated against him and denied him the benefits of NISD's educational programs and school-sponsored activities on the basis of race. Accordingly, Gray can establish a prima facie case of Defendants' race discrimination in violation of his Fourteenth Amendment right to equal protection and Title VI.

ii.    **Prima Facie Case of Race Discrimination under the**
*McDonnell Douglas* **Framework**

71.    Gray's claims are also cognizable under the *McDonnell Douglass* burden-shifting
analysis. *Harrison v. Corr. Corp. of Am.*, 476 F. App'x 40, 43 (5th Cir. 2012); *Mawle v. Texas A
& M Univ. Kingsville*, No. Civ-CC-08-64, 2010 WL 1782214, at *13 (S.D. Tex. Apr. 30, 2010).
When determining whether the plaintiffs established a prima facie case of discrimination, the
Court must view the evidence in the light most favorable to the plaintiffs. *Turner v. Kansas
City S. Ry. Co.*, 675 F.3d 887, 895 (5th Cir. 2012), as revised (Jun. 22, 2012).

72.    No doubt Gray meets the first two requirements of the *McDonnell Douglas*
analysis. *See*, *Washington*, 532 F.Supp.2d at 810. As a Black male, Gray belongs to a protected
class, and he has clearly suffered adverse actions from Defendants' conduct, including being
placed in ISS and DAEP, denied in-class instruction and participation in extracurricular
activities because of alleged noncompliance with the hair policy. *Id*. Gray has also been treated
less favorably than similarly situated non-Black students who were not likewise tracked,
targeted and subjected to NISD's Dress Code and Hair Policy.

73.    In *Hollins v. Atlantic Co.,* the Sixth Circuit found that the plaintiff, a Black
woman, established a prima facie case of race discrimination that resulted from her company's
imposition of its hair policy against her. 188 F.3d 652, 661–62 (6th Cir. 1999). The plaintiff
had been reprimanded by her employer for purportedly violating its hair policy and was
required to submit pictures of hairstyle changes for pre-approval. *Id.* at 655–57. The court
found that the last element of the *McDonnell Douglas* framework (less favorable treatment than

similarly situated individuals) was met through evidence that white women wore identical hairstyles that should likewise have violated the hair policy, yet the white women "were never reprimanded, never required to present pictures of proposed hairstyles, or otherwise required to provide notice or request approval in advance for a hairstyle change." *Id.* at 660; *see also*, *Turner*, 675 F.3d at 895-99 (finding prima facie case of race discrimination where two Black employees received more severe discipline than similarly situated white employees that engaged in similar violative conduct).

74.     In this case, other non-Black students in NISD were not similarly targeted, surveilled, or removed from class for hair policy violations. Ex. 1 at ¶¶ 13, 20.  It is thus apparent that Defendants have intentionally treated Gray differently from non-Black students through enforcement of the discriminatory NISD Dress Code and Hair Policy.

### iii.     BHISD Selectively Enforced the Dress Code and Hair Policy Against Gray

75.     Gray also demonstrate that NISD selectively and discriminatorily enforced the hair policy against him. "[T]o successfully bring a selective prosecution or enforcement claim, a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right." *Bryan v. City of Madison, Miss.*, 213 F.3d 267, 277 (5th Cir. 2000).

76.     NISD monitored and enforced the NISD Dress Code and Hair Policy against Gray and did not similarly monitor and enforce such policy against white male students during the same time.

### 3.  NISD's Dress Code and Hair Policy Violates Gray's First Amendment Right to Free Speech

77.  Gray will likely prevail on his claim against Defendants for violation of his First Amendment right to speak freely without repercussions from government brought under 42 U.S.C. § 1983.[12] Specifically, pursuant to NISD's Dress Code and Hair Policy, Defendants imposed disciplinary measures against Gray for expressing his culture and heritage through wearing locs.

78.  Expressive conduct that is not verbal or written can still constitute speech for purposes of the First Amendment if the conduct is sufficiently "communicative" or meant to send a message that is received by others. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001). Courts in the Fifth Circuit recognizes that visibly wearing one's hair in a particular manner is expressive conduct capable of communicating one's identity or heritage. *Arnold v. Barbers Hill Indep. School District*, 479 F. Supp. 3d 511, 589 (S.D. Tex. Aug. 17, 2020); *Gonzales v. Mathis Independent School District*, No. 2:18-cv-43, 2018 U.S. Dist. LEXIS 216577, at *21 (S.D. Tex. Dec. 27, 2018); *see also*, *A.A. v. Needville Indep. Sch. Dist.,* 701 F. Supp. 2d 863, 883 (S.D. Tex. 2009), *aff'd*, 611 F.3d 248, 264 (5th Cir. 2010). Here, Gray's locs are sufficiently communicative to warrant First Amendment protection. Gray wears his natural hair in locs as a symbolic expression of his Black culture and connection to his Black community. Gray's locs are a symbol widely understood as a Black hairstyle connected to Black

---

[12] Pursuant to the Fourteenth Amendment, the prohibition extends to rules imposed by state-authorized actors, such as public school districts. *See*, U.S. Const. amend. XIV.

identity and heritage. This communicative hairstyle constitutes protected speech in the school setting because Gray's locs do not impinge upon the rights of other students and do not interfere with any educational motive. *Alabama & Coushatta Tribes v. Trustees of Big Sandy Indep. Sch. Dist*, 817 F. Supp. 1319, 1333 (E.D. Tex. 1993) (*quoting Tinker*, 393 U.S. at 509) (explaining that mere "[a]nticipation of disruption due to … long hair does not justify the curtailment of [a] student's silent, passive expression of their faith and heritage").

79.    A school's policy regulating non-speech expression will survive scrutiny under the First Amendment only if: (1) the policy is within the constitutional power of the school; (2) it furthers "an important or substantial governmental interest[;]" (3) the interest is unrelated to the suppression of student expression and (4) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest. *Littlefield*, 268 F.3d at 286 (citing *U.S. v. O'Brien v*. 391 U.S. 367, 376 (1968)). In this instance, NISD cannot overcome the second, third and fourth elements to survive constitutional scrutiny.

80.    As discussed previously, Defendants have no legitimate educational interest in enforcing the hair policy against Gray, let alone an "important or substantial" interest. *Id.* NISD's Dress Code and Hair policy runs afoul of the *O'Brien* test because, by requiring Gray to cut his natural hair that express his Black culture and connection to his Black community plainly relates to the suppression of his free expression. Furthermore, as discussed in the previous section, neither the Dress Code or Hair Policy nor application of NISD's general policies to prohibit Gray's natural hair do much if anything to further NISD's asserted interests in hygiene, discipline, avoiding disruption, safety, and authority. Neither is there any

basis to conclude that short hair is more hygienic or disciplined, less disruptive, safer, or more respectful of authority than natural hair in loc. Accordingly, NISD's Dress Code and Hair Policy places a far greater restriction on Gray's free expression than is essential to further NISD's asserted interests, in violation of the First Amendment. *A.A. v. Needville Indep. Sch. Dist.,* 701 F. Supp. 2d 863, 885 (S.D. Tex. 2009).

81.     Defendants intentionally and severely punished Gray for expressing his heritage and culture with no legitimate justification other than their perceived dislike of his hair formation. Gray can establish a *prima facie* First Amendment claim and is likely to succeed on the merits.

### B.     GRAY WILL SUFFER IMMINENT, IRREPARABLE HARM THAT OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS

82.     To demonstrate the irreparable harm he will endure if NISD's enforcement of the Dress Code and Hair Policy is not enjoined, Gray "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.1986) (citations omitted). Where "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs*, Miss., 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)). Further, courts have found a substantial threat of irreparable harm exists when students have shown that they will be placed in ISS and as a result "given inferior

instruction." *Arnold,* 479 F. Supp. 3d at 529; *Alabama & Coushatta Tribes*, 817 F. Supp. at 1336-1337.

83.     Additionally, several courts have concluded that a student's exclusion from extracurricular activities constitutes irreparable harm for preliminary injunction purposes. *See, e.g., B.L. by Levy v. Mahanoy Area Sch. Dist.,* 289 F. Supp. 3d 607, 615 (M.D. Pa. 2017) (finding irreparable injury where student was barred from chief extracurricular activity on an ongoing basis).

84.     This Court should enter a temporary restraining order because irreparable injury will occur before the Court can hold a hearing on the preliminary injunction. *See*, Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed) ("Applicants for injunctive relief occasionally are faced with the possibility that irreparable injury will occur before the hearing for a preliminary injunction … can be held. The [temporary restraining] order is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction."). Gray faces additional injury absent immediate relief. At DAEP, Gray has been confined to a room for the duration of the day, where he is expected to complete homework without instruction from his regular teachers and is at risk of not meeting the educational requirements to graduate in May 2022.

85.     He receives his classroom assignments from Google Classroom but receives no instruction. Classwork and homework has been difficult for Gray to complete without the instruction afforded other students in class, and Gray has encountered difficulty with some of the assignments.

86.     Prior to being placed in DAEP, he was exempt from taking finals as a result of his acceptable grades but now is required to take final exams and is as risk of not meeting the educational requirements to graduate in May of 2022.

87.     Gray has been denied access to qualified teachers, an interactive learning environment, prohibited from participating in any of the extracurricular activities and also prohibited from going on to NISD's campus and threatened with criminal trespass. Ex. 8, Gray's Discipline Management Record (4-19-22).

88.     Gray's request for immediate injunctive relief is necessary because without returning to regular in-school instruction with qualified teachers, he is now at risk for not completing all the necessary requirements to graduate in May 2022.

89.     Gray's continued subjection to punitive consequences and suppression of his expression is an irreparable and immediate harm that this Court should remedy. *See*, *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *Trefelner ex rel. Refelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 596 (W.D. Pa. 2009) (granting TRO and finding irreparable harm where plaintiffs' free exercise rights under the First Amendment would be infringed if injunctive relief is not granted). Additionally, Gray's constitutional rights have been and continue to be violated by Defendants, which is itself an irreparable injury. *See Opulent Life Church*, 697 F.3d at 295.

90.     In contrast, Defendants will not suffer undue hardship if they are enjoined from enforcing the Dress Code and Hair Policy against Gray and allow Gray to immediately return to regular in-class instruction. Any alleged problems Defendants may have due to the

Temporary Restraining Order would be insubstantial in comparison to the potential injury to Gray if Defendants' conduct was not enjoined.

### C. IMMEDIATE INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST

91.     The entry of the requested Temporary Restraining Order and preliminary injunction will support the public's interest in protecting children from discrimination on the basis of race or sex. Courts have found that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *ODonnell v. Harris County, Texas*, 328 F.Supp.3d 643, 661 (S.D. Tex. July 27, 2018) (quoting *Jackson v. Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014)); *see also Kite v. Marshall*, 454 F. Supp. 1347, 1351 (S.D. Tex. 1978) ("Public interest is never served by a state's depriving an individual of a constitutional right."). Additionally, the relief requested promotes tolerance for diverse viewpoints, and fosters understanding and sensitivity towards students of all backgrounds. *See*, *Alabama & Coushatta Tribes v. Trustees of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1337 (E.D. Tex. 1993) (finding preliminary injunctive relief was in the public interest when it fostered sensitivity towards Native American students who wore their hair in noncompliance with the dress code due to their religious beliefs). Finally, the public has a strong interest in in the enforcement of constitutional rights, particularly in the context of public schools. *A.A. v. Needville Indep. Sch. Dist.,* 701 F. Supp. 2d 863, 885 (S.D. Tex., 2009).

### D. THE COURT SHOULD DISPENSE WITH THE BOND REQUIREMENT

92.     Plaintiff respectfully submits that the Court should not and need not require a bond for the TRO. Federal Rule of Civil Procedure 65(c) vests this Court with discretion as

to whether to require a bond and, if so, the amount. A district court may dispense with the filing of a bond altogether. *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996); *Gordon v. City of Houston, Tex*., 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015) (granting waiver of bond when there was no risk of monetary loss to Defendant as a result of the preliminary injunction). Where, as here, there is no likelihood that an injunction enjoining enforcement of the hair policy will pose any harm to the Defendants, there should be no bond. If required, however, Plaintiff is willing and able to post a reasonable bond as ordered by the Court, in support of any injunctive order issued by the Court.

## V.
## CONCLUSION AND PRAYER

93.     Plaintiff respectfully requests, along with all other relief at law or in equity to which he is justly entitled, that a TRO be immediately issued allowing Gray to return to regular in-class instruction and to participate in all NISD's extracurricular activities, including the commencement ceremony for graduating seniors on Friday, May 20, 2022, that a preliminary injunction hearing be set, and that after such hearing, a preliminary injunction be issued against Defendants as follows:

    a.     enjoining NISD from enforcing its discriminatory Dress Code and Hair Policy against Gray; and

    b.     requiring NISD to allow Grey to immediately transfer back into regular in-class instruction and allow him to participate in extracurricular activities including the commencement ceremony for graduating seniors on Friday, May 20, 2022, without cutting his natural locs.

Respectfully Submitted,

MOORE & ASSOCIATES
Lyric Centre
440 Louisiana Street, Suite 1110
Houston, Texas 77002-1055
Telephone: (713) 222-6775
Facsimile: (713) 222-6739


By: _____
 Melissa Moore
 Tex. Bar No. 24013189
 S.D. Tex. Bar. No. 25122
 melissa@mooreandassociates.net
 Curt Hesse
 Tex. Bar. No. 24065414
 S.D. Tex. Bar. No. 968465
 curt@mooreandassociates.net
 Rochelle Owens
 Tex. Bar No. 240048704
 S.D. Tex. Bar. No. 590507
 rochelle@mooreandssociates.net

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF CONFERENCE

On April 21, 2022, after being served with the lawsuit, Plaintiff's emailed Superintendent Rhodes and requested a call from the District's counsel to discuss whether a resolution could be reached prior to Plaintiff filing his Motion for Temporary Restraining Order. As of April 26, 2022, neither counsel for Defendants nor Defendants have responded.

Melissa Moore

## CERTIFICATE OF SERVICE

Pursuant to FED. R. CIV. P. 5, I certify that I have served this document on all other parties—which are listed below—on April 26, 2022, as follows:

Defendants Needville Independent School District;

NISD'S Board of Trustees Board members Chris Janicek, Kim Janke, Scott Valchar, Tim Sbrusch, Chase Raska, Glenn Vecera and John West;

NISD Superintendent Curtis;

NISD Hill High School Principal Steve Adamson; and

Assistant Principal Derek Maresh

16319 Highway 36

Needville, Texas 77461

rhodesc@needvilleisd.com

☒ mail
☐ personal delivery
☐ delivery to clerk's office
☒ electronic means
☐ CM/ECF system


_____
Melissa Moore